KELLY ARMSTRONG, ESQ. (SBN 213036)
MATTHEW P. VANDALL, ESQ. (SBN 196962)
**THE ARMSTRONG LAW FIRM**
A Professional Corporation
302 Caledonia Street, Suite 4
Sausalito, California 94965
Telephone: (415) 331-4400
Facsimile: (415) 331-4407
kelly@thearmstronglawfirm.com
matt@thearmstronglawfirm.com

BARBARA E. FIGARI (SBN 251942)
**THE FIGARI LAW FIRM**
A Professional Corporation
380 South Lake Avenue, Suite 104
Pasadena, California 91101
Telephone (626) 486-2620
Facsimile (877) 459-3540
barbara@figarilaw.com

Attorneys for Plaintiff
ROBERT MACKINNON

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MACKINNON, an individual, | Case No.  15-CV-05231-TEH |
| Plaintiff, | **THIRD AMENDED COMPLAINT FOR DAMAGES:** |
| vs. | (1) WRONGFUL TERMINATION/ ABUSIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY; |
| LOGITECH INC., a California corporation doing business in California; LIFESIZE, INC., a Delaware Corporation; and DOES 1-50, inclusive, | (2) BREACH OF IMPLIED CONTRACT; (3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; |
| Defendants. | (4) DEFAMATION; (5) UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200, *et seq*.; (6) AGE DISCRIMINATION IN VIOLATION OF FEHA; (7) FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF FEHA; (8) AGE DISCRIMINATION IN VIOLATION OF THE ADEA; and |

(9) AGE DISCRIMINATION IN
    VIOLATION OF MARYLAND
    STATE LAW.

**DEMAND FOR JURY TRIAL**
**PUNITIVE DAMAGES SOUGHT**

Complaint Filed:  March 30, 2015
Trial Date:       Not set.

[TITLE OF PLEADING]

Plaintiff alleges as follows:

## INTRODUCTION

1.     This is an action for damages as to: (1) Wrongful Termination/Abusive Discharge in Violation of Public Policy; (2) Breach of Implied Contract; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Defamation; (5) Unfair Business Practices; (6) Age Discrimination in Violation of FEHA; (7) Failure to Prevent Discrimination in Violation of FEHA; (8) Age Discrimination – ADEA; and (9) Age Discrimination in Violation of Maryland State Law.

2.     This action arises out of events involving Plaintiff ROBERT MACKINNON and Defendants LOGITECH INC., a California corporation; LIFESIZE, INC., a Delaware corporation; and DOES 1-50.

## THE PARTIES

3.     Plaintiff ROBERT MACKINNON (hereinafter "Plaintiff" or "MACKINNON") is informed and believes and thereon alleges that LOGITECH INC. (hereinafter referred to as "LOGITECH") was at all times relevant herein a corporation doing business in California and headquartered in California.  Plaintiff believes and thereon alleges that LIFESIZE, INC. has been doing business in California since it was incorporated on October 10, 2014.

4.     Plaintiff is informed and believes and thereon alleges he was employed in Maryland by Lifesize Communications, Inc. from approximately July 2007 to December 11, 2009.  Lifesize Communications, Inc. was acquired by LOGITECH in 2009. Plaintiff is informed and believes and thereon alleges he was employed in Maryland by LOGITECH from approximately December 11, 2009 through January 2, 2015.  Plaintiff is informed and believes and thereon alleges he was employed in Maryland by LOGITECH and LIFESIZE as joint employers from approximately October 10, 2014 through January 2, 2015.

5.     Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 50, and therefore sues them by such fictitious names.

Plaintiff is informed and believes and thereon alleges that said Defendants are in some manner legally responsible for the activities and damages alleged herein.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

6.      Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the Defendants were acting as the partner, agent, servant, and employee of each of the remaining Defendants, and in doing the things alleged herein was acting within the course and scope of such agency and with the knowledge of the remaining Defendants.

## JURISDICTION

7.      This Court has personal jurisdiction over LOGITECH because it is a California resident, it is headquartered in California, it is a California corporation, it transacts a substantial amount of business in California, and the tortious acts LOGITECH is herein alleged to have committed against MACKINNON occurred substantially in California, including but not limited to LOGITECH's California-based personnel ratifying the tortious conduct of LIFESIZE.

8.      This Court has personal jurisdiction over LIFESIZE because it transacts a substantial amount of business in California, the tortious acts LIFESIZE is herein alleged to have committed against MACKINNON occurred substantially in California, and the tortious acts of LOGITECH that LIFESIZE aided and abetted occurred substantially in California.

## VENUE

9.      Venue is proper in this District because LOGITECH resides in the County of Alameda, within this District, and a substantial part of the events or omissions giving rise to the claim occurred in County of Alameda, pursuant to, *inter alia*, Government Code section 12965.

10.      Venue is further proper in this District pursuant to Government Code section 12965(b), in that LOGITECH'S personnel records, and other records related to

the unlawful practices alleged herein, are maintained at its corporate offices in Newark, California, within the County of Alameda, in this District.

11.     The venue provisions set forth in Government Code section 12965 are applicable both to Plaintiff's causes of action for violation of the Fair Employment and Housing Act ("FEHA"), and all non-FEHA causes of action concurrently plead herein. (*See Brown v. Superior Court* (1984) 37 Cal.3d 478.

## GENERAL ALLEGATIONS

12.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

13.     In July 2007, Lifesize Communications, Inc. employed MACKINNON as the Eastern United States Channel Manager.  MACKINNON performed well, and in January 2008, Lifesize Communications, Inc. promoted him to Regional Sales Manager.

14.     In January 2009, MACKINNON was partnered with Bill Drucis (hereinafter "DRUCIS") as the sales team for the newly formed Mid-Atlantic Territories. Over the next several years, MACKINNON and DRUCIS exhibited excellent work performance and sales numbers.  They were recognized in 2009 as members of Lifesize Communication, Inc.'s Circle of Excellence; received the Top Gun award in 2010 for having the highest performing territory in the Americas and obtaining 120% of their sales quota; and were recognized for the Best Overall Performance in the Eastern United States in 2011.

15.     On December 11, 2009, MACKINNON became an employee of LOGITECH.  Lifesize Communications, Inc. was acquired by LOGITECH. LOGITECH began operating the Lifesize business as a division of LOGITECH.

16.     LIFESIZE and LOGITECH shared a corporate reporting structure following LOGITECH'S 2009 acquisition of LIFESIZE.  Decision in this case pertaining to Plaintiff's employment were made by executive and supervisors of both LOGITECH and LIFESIZE.

17.     Documents delivered to Plaintiff by Defendants, including his total cash compensation for Fiscal Year 2015 were signed by LIFESIZE executives James Goodyear.  LIFESIZE Vice President Matt Collier made promises to Plaintiff on behalf of both LOGITECH and LIFESIZE regarding Plaintiff's Restricted Stock Units.

18.     Plaintiff's termination letter, received via email on January 2, 2015, was signed by LIFESIZE Vice President and Chief Financial Officer Michael Lovell.

19.     Both LOGITECH and LIFESIZE issued rules and policies to Plaintiff which governed the terms and conditions of his employment.

20.     MACKINNON was promoted to Regional Account Manager for the Mid-Atlantic Territory in September 2011.  Due to the growth in the territory, a third sales person, Chris Emminizer (hereinafter "EMMINIZER"), was added to the team.  In March 2012, DRUCIS left the team.  MACKINNON and EMMINIZER continued to do the work of three people while waiting for DRUCIS's replacement.  EMMINIZER quit in October 2012, MACKINNON worked the territory alone yet still exceeded its sales quota at 119%.  MACKINNON was then working with Bill Miller and Gordon Miller.  In January 2013, MACKINNON was recognized as the top Lifesize Americas salesperson for in 2012 and he was given a $5,000 bonus in appreciation by Chief Executive Officer Colin Buechler.

21.     In August 2013, after layoffs and some reorganization, the Mid-Atlantic Territory sales team consisted of MACKINNON, DRUCIS and Sophia McCulloch (hereinafter "MCCULLOH").  MACKINNON continued to excel with the new team.  In July 2014, Matt Collier (hereinafter "COLLIER"), the Vice President of Sales for the Lifesize division of Logitech, thanked him "for all your efforts this past year!"  In addition, COLLIER informed MACKINNON that he would be receiving a raise and be promoted to Senior Regional Sales Manager.

22.     On October 6, 2014, the sales numbers were announced for the second quarter, July to September 2014.  The Mid-Atlantic Territory was one of only four territories to exceed its quota, while three territories were 80% or below in their quotas.

7

In order to increase sales, a sales contest was announced for the third quarter.  In November 2014, MACKINNON announced that five territories had met the first threshold in the sales contest and remained eligible to win the contest.  Not surprisingly, the Mid-Atlantic Territory was one of these high-performing territories.

23.     On November 11, 2014, Craig Malloy (hereinafter "MALLOY"), the Chief Executive Officer for the Lifesize division of LOGITECH and the Chief Executive Officer of LIFESIZE, held a company-wide meeting.  During the meeting he congratulated certain territories and individual team members, including MACKINNON, on exceeding their quotas for the second quarter.  MALLOY also announced a plan to create a new corporation, LIFESIZE, INC., which would be largely owned by LOGITECH, but also give employees some ownership.  In fact, LIFESIZE had already been incorporated in Delaware at the time this announcement was made.  MALLOY told the Lifesize employees that they would be provided ownership in LIFESIZE in the form of restricted stock units by December 31, 2014.  However, MACKINNON never received his restricted stock units as promised.

24.     In early December 2014, DRUCIS forecasted that third quarter sales for the Mid-Atlantic Territory would meet 89% of its quota.  The forecast was based in part on opportunities that MACKINNON, DRUCIS, and MCCULLOCH were currently working on.  On the final day of the quarter, MACKINNON learned that the team sales would be lower than forecasted.  MACKINNON's performance was not the cause of the lower-than-expected sales as he completed his pending deal on time.  DRUCIS and MCCULLOCH, however, did not complete their deals as expected.

25.     On December 30, 2014, DRUCIS held a team video conference with MACKINNON and MCCULLOCH.  The team discussed some reorganization within the territory, and plans for an in-person team meeting in mid-January.  DRUCIS neither raised any concerns regarding MACKINNON's performance nor did he discuss putting MACKINNON on a Performance Plan.

26.     Lifesize Communications, Inc. had a policy of putting underperforming employees on a Performance Plan.  The Lifesize division of LOGITECH, and LIFESIZE have a policy of putting underperforming employees on a Performance Plan.  This policy is the same at both companies, and constitutes a joint employment policy.

27.     MACKINNON was never placed on a Performance Plan nor was he ever told he had performance issues.  For example, during calls in December 2014 with DRUCIS, COLLIER, and Mark Brady (hereinafter "BRADY"), LIFESIZE's Vice President of Sales for the East, no one told MACKINNON that they had concerns regarding his work performance.

28.     On January 2, 2015, DRUCIS informed MACKINNON that he was being terminated due to his performance.  MACKINNON was completely shocked by DRUCIS' statements against him.  MACKINNON was an excellent employee and repeatedly exceeded his performance targets.

29.     Plaintiff is informed and believes and thereon alleges that the decision to terminate MACKINNON was made, in whole or in part, by LOGITECH employees in California.

30.     The letter Plaintiff received from Defendants informing him that his employment had been terminated was drafted and sent from Defendants' offices in California.

31.     Plaintiff's final check was sent to him from Defendants' offices in California.

32.     At the time of his termination, the only Human Resources employees with whom Plaintiff had any contact were located in California.  Plaintiff had previously been working with Human Resources based in Texas, but the Texas-based consultant passed away in 2014, and Plaintiff was directed to then utilize Defendants' Human Resources services in California for all matters relating to the terms and conditions related to his employment.

33.     He exceeded his performance targets for the past seven years, including for 2014, and was one of the highest-paid sales representatives for LIFESIZE.  In addition, executives COLLIER and BRADY both sent MACKINNON emails congratulating him on his excellent work.  LOGITECH and LIFESIZE employees made false and disparaging remarks to third parties about MACKINNON's work performance, his competence to carry out the duties of his position, his professional appearance, and his professional conduct, including the false suggestion that he was unprofessional in his interactions with clients and sales prospects.

34.     MACKINNON's individual performance in the Mid-Atlantic Territories was strong for the past several years.  For example, MACKINNON was responsible for 56.8% of the team sales for the 2013 fiscal year and 64.4% of the sales for the 2014 fiscal year.  After MCCULLOCH joined the team, MACKINNON's sales percentage dropped since he gave some of his territory to her.  On December 1, 2014, MACKINNON emailed DRUCIS a breakdown of the individual sales by MACKINNON, DRUCIS and MCCULLOCH for the first half of fiscal year 2015.  MACKINNON's individual sales remained the highest on the team with 44%, DRUCIS had 43% of the sales and MCCULLOCH had only 13% of the sales.  MCCULLOCH is significantly younger than MACKINNON, and she was not terminated for poor performance.

35.     After his termination, MACKINNON spoke with several employees in an attempt to ascertain the true reason for his termination.  First, MACKINNON spoke with LIFESIZE's Chief Financial Officer, Michael Lovell (hereinafter "LOVELL").  However, LOVELL told MACKINNON there was nothing else LIFESIZE could do.  MACKINNON then contacted the human resources department for LOGITECH.  MACKINNON communicated with Karen Droksy, LOGITECH's Vice President of Human Resources who works for LOGITECH in California, and Veronica Avila, a member of LOGITECH's human resources department in California.  Ms. Avila looked into MACKINNON's termination and confirmed that he was being terminated for cause.

In California, LOGITECH ratified the discriminatory decision to terminate MACKINNON's employment.

36.     LOGITECH and LIFESIZE discriminated against MACKINNON because of his age.  He was 52 years old when he was wrongfully terminated.  In addition to MACKINNON, five other employees were terminated on or about January 2, 2014.  Of these employees, most were over 40 years old.

37.     LOGITECH and LIFESIZE terminated MACKINNON in order to prevent him from obtaining the Restricted Stock Units that he was promised.

38.     LOGITECH and LIFESIZE are cultivating a work environment that encourages discrimination against older employees.  For example, MALLOY recently gave an interview with National Public Radio ("NPR").  The interview shows how MALLOY, LOGITECH, and LIFESIZE are pushing out the "baby boomers" in favor of encouraging "millennials" to work for LIFESIZE.  MALLOY was quoted as saying "People in my generation [baby boomers] will never be as comfortable and as up to speed with what's happening on social media and Web applications."  When discussing the loss of baby boomer employees, MALLOY said that his company needs to change with the industry, even if that means leaving some people behind.  Terminating MACKINNON's employment LOGITECH and LIFESIZE was part of MALLOY's strategy to push baby boomers out of LOGITECH and LIFESIZE.  When the decision to terminate MACKINNON's employment was made, the decisionmaker was aware of and motivated by MALLOY's stated desire to retain younger employees and discard those over 40 years old.

39.     MACKINNON was shocked at the abrupt manner in which he was informed that his employment was being terminated.  MACKINNON was shocked and humiliated to learn that he was being accused of substandard work performance.  Before that, he worked in the industry for 25 years and had never been fired.

40.     MACKINNON has experienced significant emotional distress as a result of being terminated from his job at LOGITECH and LIFESIZE through present and ongoing.

**FIRST CAUSE OF ACTION**

**WRONGFUL TERMINATION/ABUSIVE DISCHARGE**

**IN VIOLATION OF PUBLIC POLICY**

**AGAINST ALL DEFENDANTS**

41.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

42.     Plaintiff's wrongful termination from his employment with Defendants was based upon Defendants' violation of the Public Policy of the State of California as put forward in the Fair Employment Housing Act, the California Constitution, the Age Discrimination in Employment Act, and other statutes and provisions, because it was motivated by Plaintiff's age.

43.     Plaintiff's wrongful termination from his employment with Defendants was an abusive discharge in violation of public policy of the State of California because it was discriminatory based on age and because it was intended to interfere with his collection of the Restricted Stock Units to which he was entitled.

44.     Plaintiff's wrongful termination was in violation of the common law of the States of California and Maryland, as expressed in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 and *Adler v. American Standard Corporation* (1981) 291 Md. 31.

45.     Plaintiff's wrongful termination from his employment with Defendants was likewise based upon Defendants' violation of the Public Policy of the State of Maryland because it was motivated by Defendants' desire to interfere with Plaintiff collecting the Restricted Stock Units that he was promised.

46.     Plaintiff's wrongful termination from his employment with Defendants was an abusive discharge in violation of public policy of the State of Maryland because

it was intended to interfere with his collection of the Restricted Stock Units to which he was entitled.  Plaintiff's wrongful termination was in violation of the common law of the States of Maryland, as expressed in *Adler v. American Standard Corporation* (1981) 291 Md. 31 (and "*Adler* claim").

47.    It is public policy of the State of California that employees should be paid what they have earned.  Labor Code sections 200, 201, 203, 210, and 216.  It is an unfair business practice for a business to fail to pay an employee what he or she has earned.  Business & Professions Code section 17200, *et seq*.  Equity promised to employees as compensation for their work and loyalty is recognized as "wages" per Labor Code section 200, subsection (a).

48.    As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer substantial monetary losses incurred; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

49.    Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants.  Plaintiff is therefore entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
## AGAINST ALL DEFENDANTS

50.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

51.    On or about November 11, 2014, Plaintiff and Defendants entered into an implied oral contract that Plaintiff would continue to work for Defendants and that Plaintiff would receive stock in LifeSize, Inc.  Plaintiff accepted Defendants' offer by

continuing to work for Defendants.  Defendants' statements that Plaintiff would receive stock in LifeSize, Inc. if he continued to work for Defendants constituted an offer, which Plaintiff accepted by performance, creating a binding implied contract.

52.     At all relevant times alleged herein, Plaintiff performed his obligation under the both contracts with Defendants.  Defendants breached their implied contractual commitments to Plaintiff by terminating his employment and by not providing him with stock in LifeSize, Inc.

53.     As a direct and proximate result of Defendants' breach, Plaintiff has economic loss in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

54.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

55.     On or about November 11, 2014, Plaintiff and Defendants entered into an oral contract that Plaintiff would continue to work for Defendants and that Plaintiff would receive stock in LifeSize, Inc.  On or about November 11, 2014, Plaintiff and Defendants entered into an implied oral contract that Plaintiff would continue to work for Defendants and that Plaintiff would receive stock in LifeSize, Inc.  Plaintiff accepted Defendants' offer by continuing to work for Defendants.

56.     Plaintiff was deprived of receiving at least 600 Restricted Stock Units ("RSU") because of his wrongful termination.  Plaintiff was to have 300 RSUs vest in 2015, with an additional 300 RSUs vest no later than November 2016.

57.     At all relevant times alleged herein, Plaintiff performed his obligation under the both contracts with Defendants.  Defendants breached their implied contractual commitments to Plaintiff by terminating his employment and by not providing him with stock in LifeSize, Inc.

58.     Defendants unfairly interfered with Plaintiff's rights under both contracts to receive the stock by terminating his employment and by not providing him with stock in LifeSize, Inc.

59.     As a direct and proximate result of Defendants' breach, Plaintiff has economic loss in an amount to be proven at the time of trial.

**FOURTH CAUSE OF ACTION**

**DEFAMATION**

**AGAINST ALL DEFENDANTS**

60.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

61.     Plaintiff is informed and believes that Defendants, and each of them, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited internal publications of defamation, of and concerning Plaintiff's performance, internally within LOGITECH and LIFESIZE.

62.     Matt Collier, a Vice President of LIFESIZE, sent an email to all of the Americas Sales Team, on which he copied the Executive Staff, Jenny Snoddy, and Jenna Blend from LIFESIZE Human Resources.  Mr. Collier stated that the "actions" earlier in the day – which were the terminations of six people from the sales team, including Plaintiff – were "largely performance based actions."  Plaintiff was recognized multiple times as a top performer for Defendants, and this email defamed Plaintiff.

63.     Plaintiff is informed and believes and thereon alleges that this email was the basis of subsequent correspondence from Defendants' employees to Plaintiff's former clients as to the reason he was no longer employed with Defendants.

64.     LIFESIZE Sales Director Eric Tuttle contacted David Kuklinski, a former LIFESIZE employee, and stated the firings – including the termination of Plaintiff's employment – were "all about performance.  If you didn't hit your numbers in the last 12 months you were let go."  This statement was defamatory to Plaintiff's business

reputation, because it was false.  Plaintiff did hit his numbers in the 12 months prior to his termination, and was praised for doing so shortly before he was terminated.

65.    These emails, and all subsequent defamatory communications from Defendants, including the forced self-publication of the same, severely damaged Plaintiff's award-winning reputation that was built over 25 years within the industry.

66.    All of the defamatory comments alleged herein were made within one year prior to the original filing of Plaintiff's lawsuit.  Plaintiff is informed and believes the emails were sent on or about January 2, 2015, and that the comments were made to vendors, customers and partners beginning on that day, and continuing to the present.

67.    Plaintiff is informed and believes that these publications were outrageous, negligent, reckless, intentional, and maliciously published by Defendants, and each of them.  Plaintiff is informed and believes that the negligent, reckless, and intentional publications by Defendants, and each of them, were published by Defendants, their agents and employees.  Plaintiff hereby seeks damages for these publications and all foreseeable republications discovered up to the time of trial.

68.    During the above-described time-frame, Defendants, and each of them, conspired to, and in fact did, negligently, recklessly, and intentionally cause excessive and unsolicited publication of defamation, of and concerning Plaintiff, to each other and to third persons, who had no need or desire to know.  Those third persons to whom these Defendants published this defamation are believed to include, but are not limited to, other agents and employees of Defendants, and each of them, and the community, all of whom are known to Defendants, and each of them, but unknown at this time to Plaintiff.

69.    The defamatory publications consisted of oral and written, knowingly false and unprivileged communications, tending directly to injure Plaintiff and Plaintiff's personal, business, and professional reputation.  The defamatory publications include false statements about MACKINNON's work performance, his competence to carry out the duties of his position, that he was to blame for his team not reaching its quota, his professional appearance in that he did not wear appropriate business attire, and his

professional conduct, including the false suggestion that his interactions with clients and sales prospects were unprofessional and discourteous like a 'used-car salesman,' and the false suggestion that he was disruptive and talked over colleagues.

70.    Plaintiff is informed, believes and fears that these false and defamatory statements will continue to be published by Defendants, and each of them, and will be foreseeably republished by their recipients, all to the ongoing harm and injury to Plaintiff's business, professional, and personal reputations.  Plaintiff also seeks redress in this action for all foreseeable republications.

71.    The defamatory meaning of all of the above-described false and defamatory statements and their reference to Plaintiff, were understood by these above-referenced third person recipients and other members of the community who are known to Defendants, and each of them, but unknown to Plaintiff at this time.

72.    None of Defendants' defamatory publications against Plaintiff referenced above are true.

73.    The above defamatory statements were understood as assertions of fact, and not as opinion.  Plaintiff is informed and believes this defamation will continue to be negligently, recklessly, and intentionally published and foreseeably republished by Defendants, and each of them, and foreseeably republished by recipients of Defendants' publications, thereby causing additional injury and damages for which Plaintiff seeks redress by this action.

74.    Each of these false defamatory *per se* publications were negligently, recklessly, and intentionally published in a manner equaling malice and abuse of any alleged conditional privilege, which Plaintiff denies existed, since the publications, and each of them, were made with hatred, ill will, and an intent to vex, harass, annoy, and injure Plaintiff in order to justify the illegal and cruel actions of Defendants, and each of them, to cause further damage to Plaintiff's professional and personal reputation.

75.    Each of these publications by Defendants were made with knowledge that no investigation supported the unsubstantiated and obviously false statements.  The

Defendants published these statements knowing them to be false, unsubstantiated by any reasonable investigation and the product of hostile witnesses.  These acts of publication were known by Defendants, and each of them, to be negligent to such a degree as to be reckless.  In fact, not only did Defendants, and each of them, have no reasonable basis to believe these statements, but they also had no belief in the truth of these statements, and in fact knew the statements to be false.  Defendants, and each of them, excessively, negligently, and recklessly published these statements to individuals with no need to know, and who made no inquiry, and who had a mere general or idle curiosity of this information.

76.     The above complained-of publications by Defendants, and each of them, were made with hatred and ill will towards Plaintiff and the design and intent to injure Plaintiff, Plaintiff's good name, his reputation, employment and employability. Defendants, and each of them, published these statements, not with intent to protect any interest intended to be protected by any privilege, but with negligence, recklessness and/or an intent to injure Plaintiff and destroy his reputation.  Therefore, no privilege existed to protect any of the Defendants from liability for any of these aforementioned publications or republications.

77.     As a proximate result of the publication and republication of these defamatory statements by Defendants, and each of them, Plaintiff has suffered injury to his personal, business and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost wages and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount according to proof.

78.     Defendants, and each of them, committed the acts alleged herein recklessly, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, for an improper and evil motive amounting to malice, and which

abused and/or prevented the existence of any conditional privilege, which in fact did not exist, and with a reckless and conscious disregard of Plaintiff's rights.

79.     All actions of Defendants, and each of them, their agents and employees, herein alleged were known, ratified and approved by the Defendants, and each of them. Plaintiff thus is entitled to recover punitive and exemplary damages from Defendants, and each of them, for these wanton, obnoxious, and despicable acts in an amount based on the wealth and ability to pay according to proof at time of trial.

**FIFTH CAUSE OF ACTION**

**UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200, *et seq*.**

**AGAINST ALL DEFENDANTS**

80.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

81.     Defendants' conduct, as alleged herein, has been, and continues to be, unfair, unlawful and harmful to Plaintiff, to the general public, and Defendants' competitors.  Accordingly, Plaintiff seeks to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure section 1021.5.

82.     Defendants' activities as alleged herein are violations of California law, and constitute unlawful business acts and practices in violation of California Business & Professions Code section 17200, *et seq*.

83.     A violation of California Business & Professions Code section 17200, *et seq*. may be predicated on the violation of any state or federal law.  In this instant case, Defendants' policies and practices of promising stock to employees in exchange for continued employment, and then terminating an employee without cause and not providing stock, violate California laws including Labor Code sections 200, 201, 203, 210, and 216, and laws of contract including the obligation to keep the implied covenant of good faith and fair dealing.

84.     Plaintiff has been personally injured by Defendants' unlawful business acts and practices as alleged herein, including but not necessarily limited to the loss of money and/or property.

85.     Pursuant to California Business & Professions Code sections 17200, *et seq.*, Plaintiff is entitled to restitution of the unpaid compensation, including stock in LifeSize, Inc., withheld and retained by Defendants; a permanent injunction requiring Defendants to provide the unpaid stock due to Plaintiff; an award of attorneys' fees pursuant to California Code of Civil procedure section 1021.5 and other applicable laws; and an award of costs.

## SIXTH CAUSE OF ACTION
## AGE DISCRIMINATION
## VIOLATION OF CAL. GOV. CODE §§ 12940 *et seq.*
## AGAINST ALL DEFENDANTS

86.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

87.     Defendants, through their agents and employees engaged in a pattern and practice of unlawful age discrimination in violation of the Fair Employment and Housing Act ("FEHA") in connection with the terms and conditions of Plaintiff's employment and the performance standard to which Plaintiff was held.

88.     At all relevant times, Defendants had actual and constructive knowledge of the discriminatory conduct described and alleged herein, and condoned, ratified and participated in the discrimination.

89.     Plaintiff filed timely complaints against the Defendants with California's Department of Fair Employment and Housing ("DFEH") alleging discrimination on March 12, 2015. Plaintiff received from the DFEH notification of his right to sue in the Courts of the State of California, the Defendants against which complaints had been filed.

90.     As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by Defendants, Plaintiff has suffered mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

91.     Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants. Plaintiff is therefore entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

92.     By reason of the conduct of Defendants and each of them as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the within action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.  As a result of Defendants' and each of their actions, Plaintiffs sustained economic damages to be proven at trial.  As a further result of Defendants' and each of their actions, Plaintiffs suffered emotional distress; resulting in damages to be proven at trial.

93.     The above harassing and discriminatory conduct violates FEHA, Government Code §§ 12940 and 12941 and California Public Policy and entitles Plaintiffs to all categories of damages, including exemplary or punitive damages.

## SEVENTH CAUSE OF ACTION
## FAILURE TO PREVENT DISCRIMINATION
## VIOLATION OF CAL. GOV. CODE §§ 12940 *et seq.*
## AGAINST ALL DEFENDANTS

94.     Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

95.     In violation of the FEHA, Defendants failed to take all reasonable steps necessary to prevent discrimination against employees.

96.     In perpetrating the above-described conduct, Defendants, and each of them, engaged in a pattern, practice, policy and custom of unlawful discrimination.  Said conduct on the part of Defendants, and each of them, constituted a policy, practice, tradition, custom and usage which denied Plaintiff's protection of the civil rights statutes enumerated above.

97.     At all relevant time periods Defendants, and each of them, failed to make an adequate response and investigation into the conduct of Defendants and the aforesaid pattern and practice, and thereby established a policy, custom, practice or usage within the organization of Defendants, which condoned, encouraged, tolerated, sanctioned, ratified, approved of, and/or acquiesced in unlawful discrimination towards employees of Defendants, including, but not limited to, Plaintiff.

98.     At all relevant time periods there existed within the organization of Defendants, and each of them, a pattern and practice of conduct by their personnel which resulted in discrimination, including but not necessarily limited to, conduct directed at Plaintiff.

99.     Defendants did not provide adequate discrimination training with respect to its employees and managers.

100.    Defendants, and each of them, knew or reasonably should have known that the failure to provide any or adequate education, training, and information as to their personnel policies and practices regarding discrimination would result in discrimination.

101.    The failure of Defendants, and each of them, to provide any or adequate education, training, and information to personnel concerning policies and practices regarding discrimination for complaining of or resisting the same, constituted deliberate indifference to the rights of employees, including but not limited to those of Plaintiff.

102.    Plaintiff filed timely complaints against the Defendants with the DFEH alleging discrimination. Plaintiff received from the DFEH notification of his right to sue in the Courts of the State of California, the Defendants against which complaints had been filed.

103.    By reason of the conduct of Defendants and each of them as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff therefore is entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

104.    As a result of Defendants' and each of their actions, Plaintiff sustained economic damages to be proven at trial.  As a further result of Defendants' and each of their actions, Plaintiff suffered emotional distress; resulting in damages to be proven at trial.

105.    The above discriminatory conduct violates California's FEHA, Cal. Gov. Code §§ 12940 et seq., and California Public Policy and entitles Plaintiff to all categories of damages, including exemplary or punitive damages.

106.    The conduct of Defendants and/or their agents/employees as described herein was malicious, and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions.  Defendants and/or their agents/employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining Defendants.  Consequently, Plaintiff is entitled to punitive damages against Defendants.

## EIGHTH CAUSE OF ACTION
## AGE DISCRIMINATION
## VIOLATION OF 29 U.S.C. §§ 621 *et seq.*
## AGAINST ALL DEFENDANTS

107.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

108.    Plaintiff was over 40 years old at the time he was terminated by Defendants.

109.    Defendants, through their agents and employees engaged in a pattern and practice of unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") in connection with the termination of Plaintiff's

employment and the performance standard to which Plaintiff was held.  Plaintiff was discharged because of his age.

110.   At all relevant times, Defendants had actual and constructive knowledge of the discriminatory conduct described and alleged herein, and condoned, ratified and participated in the discrimination.

111.   Plaintiff filed timely complaints against the Defendants with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination in May 2015. On June 18, 2015, and June 23, 2015, Plaintiff received from the EEOC offices in San Antonio and Oakland, respectively, notification of his right to sue the Defendants against which complaints had been filed.

112.   As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by Defendants, Plaintiff has suffered mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

113.   Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants. Plaintiff is therefore entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

114.   By reason of the conduct of Defendants and each of them as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.  As a result of Defendants' and each of their actions, Plaintiff sustained economic damages to be proven at trial.  As a further result of Defendants' and each of their actions, Plaintiff suffered emotional distress; resulting in damages to be proven at trial.

115.    The above discriminatory conduct violates the ADEA, and entitles Plaintiff to all categories of damages, including exemplary or punitive damages.

### NINTH CAUSE OF ACTION

### AGE DISCRIMINATION

### VIOLATION OF MARYLAND STATE GOVERNMENT ARTICLE § 20-602

### AGAINST ALL DEFENDANTS

116.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs.

117.    Defendants, through their agents and employees engaged in a pattern and practice of unlawful age discrimination in violation of Maryland State Government Article section 20-602, which provides that employers cannot discriminated against employees in connection with the terms and conditions of Plaintiff's employment and the performance standard to which Plaintiff was held on account of numerous enumerated protected characteristics, including but not limited to age.

118.    At all relevant times, Defendants had actual and constructive knowledge of the discriminatory conduct described and alleged herein, and condoned, ratified and participated in the discrimination.

119.    Plaintiff has satisfied all administrative prerequisits to the filing of this cause of action under Maryland law.

120.    As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by Defendants, Plaintiff has suffered mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

121.    Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants.

Plaintiff is therefore entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

122.     By reason of the conduct of Defendants and each of them as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the within action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.  As a result of Defendants' and each of their actions, Plaintiffs sustained economic damages to be proven at trial.  As a further result of Defendants' and each of their actions, Plaintiffs suffered emotional distress; resulting in damages to be proven at trial.

123.     The above harassing and discriminatory conduct violates State Government Article section 20-602 and entitles Plaintiffs to all categories of damages, including exemplary or punitive damages.

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for relief as follows:

1. For general damages according to proof, however, no less than the jurisdictional limit of this court;

2. For restitution in an amount according to proof;

3. For special damages in amounts according to proof;

4. For exemplary and punitive damages in amounts according to proof;

5. For specific performance of the obligation to provide stock;

6. For injunctive relief as provided by law;

7. For declaratory relief as provided by law, including, *inter alia*, that Defendants' actions against Plaintiff violated Government Code section 12940, *et seq.*, and all other statutes alleged herein;

8. For interest as provided by law;

9. For cost of suit incurred herein;

10. For attorneys' fees as provided by law; and

11. For such other and further relief as the Court deems fair and just.


Dated: March 3, 2016                    Respectfully Submitted,

                                        /s/ Barbara E. Figari

                                        _____
                                        KELLY ARMSTRONG
                                        BARBARA FIGARI
                                        Attorneys for Plaintiff
                                        ROBERT MACKINNON

THIRD AMENDED COMPLAINT

1

## **JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

Dated: March 3, 2016                    Respectfully Submitted,

4

5

/s/ Barbara E. Figari

6

_____

7

KELLY ARMSTRONG
BARBARA FIGARI

8

Attorneys for Plaintiff
ROBERT MACKINNON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT