UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MACKINNON,<br><br>Plaintiff,<br><br>v.<br><br>LOGITECH INC., et al.,<br><br>Defendants. | Case No. 15-cv-05231-TEH<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This matter is currently before the Court on Plaintiff Robert MacKinnon's motion for partial summary judgment (ECF No. 39) and Defendants Logitech Inc.'s and Lifesize, Inc.'s motion for summary judgment (ECF No. 61). As indicated in the Court's April 12, 2017 order requiring supplemental briefs (ECF No. 87), the Court finds the majority of the parties' motions suitable for resolution without oral argument. For the reasons discussed below, the Court now GRANTS IN PART Defendants' motion and DENIES IN PART Plaintiff's motion, with the issues of Plaintiff's Maryland statutory age discrimination claim and Defendants' affirmative defenses remaining for subsequent resolution.

**BACKGROUND**

Plaintiff Robert MacKinnon contends that he was jointly employed by Defendants Logitech Inc. and Lifesize, Inc., and that he was terminated by both companies on January 2, 2015. He asserts that he was terminated either because of age discrimination or because Defendants did not want to pay him restricted stock units that he contends he was promised at a company-wide meeting on November 11, 2014. He also contends that he was defamed by comments about his performance by Defendants' employees.

Following the Court's ruling on Defendants' motion to dismiss the third amended complaint ("TAC"), the following claims remain: (1) abusive discharge in violation of Maryland public policy; (2) breach of implied contract; (3) defamation; (4) age

discrimination in violation of the federal Age Discrimination in Employment Act ("ADEA"); and (5) age discrimination in violation of Maryland Code, State Government, section 20-602.

MacKinnon seeks summary judgment on his age discrimination and contract claims and on Defendants' affirmative defenses. Defendants seek summary judgment on all claims. This order resolves the motions as to all issues except MacKinnon's Maryland statutory age discrimination claim and Defendants' affirmative defenses.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings or materials in the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion. *Anderson*, 477 U.S. at 250.

## DISCUSSION

### I. Claims Against Lifesize, Inc.

The Court first considers Defendants' motion for summary judgment on all claims against Defendant Lifesize, Inc. MacKinnon contends that he was jointly employed and terminated by Defendants Logitech Inc. and Lifesize, Inc.

However, Defendants present evidence that Lifesize, Inc. was not incorporated until October 2014 and did not have any sales employees until July 2015. Malloy Decl. ¶ 3 (ECF No. 44-11). A separate entity, Lifesize Communications, Inc., was acquired by Logitech in 2009, and Craig Malloy became the CEO of the Lifesize division of Logitech in February 2014.[1] *Id.* ¶ 4. At the November 11, 2014 all-hands meeting, Malloy repeated several times that, "[w]e are all Logitech employees." Nov. 11, 2014 Tr. at 47:13-21 (Ex. J to Perry Decl. (ECF No. 64-3)). MacKinnon's April 11, 2017 supplemental brief presents evidence that "Lifesize" had an internal advisory board, but this evidence says nothing about whether Lifesize, Inc. employed MacKinnon or even had any employees at the time of his termination. In addition, the testimony indicates that the board existed several years before Lifesize, Inc. was incorporated, thus suggesting that "Lifesize" refers to the Lifesize division of Logitech. Moreover, MacKinnon himself testified that he believed he was employed by Logitech at the time of his termination, explaining that:

> My paycheck came from Logitech. . . . My employee stock purchase plan was through Logitech. My 401-K was from Logitech. The letter I received in the mail telling me I was terminated was from Logitech. The three-week check that was sent to me in the mail came from Logitech headquarters in California. My dealings afterwards were with Logitech HR. I worked for Logitech. My corporate card was Logitech.

MacKinnon Dep. at 49:8-50:1 (Ex. C to Perry Decl. (ECF No. 61-4)). No reasonable juror could conclude that MacKinnon was ever employed, let alone terminated, by Lifesize, Inc. Accordingly, Defendants' motion for summary judgment on all claims asserted against Lifesize, Inc. is GRANTED.

---

[1] *See* May 18, 2016 Order at 8 n.1 (ECF No. 28) (discussing "some confusion in the TAC" between Lifesize, Inc. and Lifesize Communications, Inc.).

3

## II. Abusive Discharge in Violation of Maryland Public Policy

Defendants also move for summary judgment on MacKinnon's claim that his termination was an abusive discharge in violation of the public policy of the State of Maryland. MacKinnon asserts that his termination violated Maryland's public policy "because it was intended to interfere with his collection of the Restricted Stock Units to which he was entitled." TAC ¶ 46 (ECF No. 22). He argues in his opposition that his termination also violated Maryland's public policy against age discrimination. However, a claim for abusive discharge under Maryland law "is inherently limited to remedying only those discharges in violation of a clear mandate of public policy *which otherwise would not be vindicated by a civil remedy*." *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 605 (1989) (emphasis added). MacKinnon fails to rebut Defendants' arguments that such civil remedies exist in this case by way of breach of contract and statutory age discrimination claims. Accordingly, Defendants' motion for summary judgment on MacKinnon's abusive discharge claim under Maryland law is GRANTED.

## III. Breach of Contract

Next, MacKinnon and Defendants both seek summary judgment on MacKinnon's breach of contract claim.[2] MacKinnon asserts that a contract to provide him with restricted stock units in Lifesize, Inc. was established at an all-hands meeting hosted by CEO Craig Malloy on November 11, 2014, and that Defendants breached that contract by terminating him before granting him any stock units.

Malloy announced at the November 2014 meeting that Lifesize, Inc. was being spun off as "a separate company that's owned by Logitech," and that Logitech agreed to distribute a certain percentage of stock shares "to the employees of the company." Nov. 11, 2014 Tr. at 51:13-52:7. He further explained that:

---

[2] MacKinnon also moves for summary judgment on his claim for breach of the implied covenant of good faith and fair dealing. However, the Court previously dismissed that claim with prejudice. May 18, 2016 Order at 5.

4

> We all become owners, everyone in the company, all employees current and future will be granted equity in the new Lifesize Inc. . . . [T]his equity will come in the form of what we call a performance stock unit, it's really a share of the – a share – you know, a portion of the company, but there's – it's only granted at a certain – a certain date, and it's not – it's not time based, it's 100 percent triggered by some change or control event.
>
> So it's not like if – if you've worked in companies where you've been granted – you know, here at Logitech, granted options at a company where they vest on a yearly basis, a four-year vest, that's not what these are.
>
> This – you'll be granted shares of stock that vest immediately at 100 percent when there is some type of a contract of control.

*Id.* at 58:10-59:6. He then explained that the "change or control event" could be an IPO, or "a spinout to . . . Logitech shareholders as a dividend," or an acquisition of some type, but he emphasized that "nothing is contemplated, nothing has been discussed, haven't even talked about it." *Id.* at 59:7-60:12.

The slides shown at the meeting stated that "Logitech has granted Lifesize 6% of the outstanding equity for employee stock grants," and that the change was "[a]nticipate[d]" to "formally take effect with employees transferred to Lifesize Inc. [on] Apr 1, 2015." Ex. A to Wayne Reply Decl. at LG001805-06 (ECF No. 50-4).[3] The slides also repeated Malloy's oral explanation that vesting would be "100% triggered by a 'change of control' event, not time," and announced an intent to "provide letters of PSU [performance stock unit] grant before the end of December." *Id.* at LG001808.

As the transcript demonstrates, at no time during the November 2014 meeting did Malloy discuss any specific stock grant to any specific employee, including MacKinnon. Nor did Malloy make any promises of continued employment. In addition, MacKinnon testified that he was never "informed of what [his] stock units would be in the new company." MacKinnon Dep. at 45:21-23. His own testimony therefore disproves the

---

[3] This ECF citation is to the redacted version of the exhibit filed with Defendants' amended motion to file documents under seal. The Court's order granting that motion (ECF No. 51) directed MacKinnon to file a redacted version of the exhibit. MacKinnon did so, but the version he filed (ECF No. 54) redacted the entire exhibit and not just the portions requested by Defendants and ordered by the Court to be sealed.

allegation in his complaint that he "was to have 300 RSUs [restricted stock units] vest in 2015, with an additional 300 RSUs vest[ing] no later than November 2016." TAC ¶ 56. As this Court previously explained, a contract cannot be "so uncertain and indefinite that the intention of the parties on material questions cannot be ascertained." *Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 552 (N.D. Cal. 2012) (citing *Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th 761, 770 (1993)). The amount of stock is one such material question.

MacKinnon also argues that he "should have received [stock units] on December 31, 2014, according to the vesting schedule in place," Pl.'s Opp'n at 25 (ECF No. 66), but this argument is unpersuasive for two reasons. First, the record establishes that any stock units offered to Lifesize employees were not scheduled to vest until some future "change of control" event that had not yet been contemplated, not on December 31, 2014. Second, the announcement that PSU grant letters would be provided by the end of December was just that – an announcement – or, at best, a promise. A promise cannot create a contract without consideration, Cal. Civ. Code § 1550, and MacKinnon offered no consideration here.

Put simply, no reasonable jury could find that MacKinnon had a contract relating to restricted or performance stock units in Lifesize, Inc. The Court therefore GRANTS Defendants' motion and DENIES MacKinnon's motion for summary judgment on his breach of contract claim.

**IV. Defamation**

Defendants also seek summary judgment on MacKinnon's defamation claim. Defamation requires "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (internal quotation marks omitted). The only defamation claim that survived Defendants' motions to dismiss is based on a January 2, 2015 email from Matt Collier, then a Vice President at Logitech who oversaw

MacKinnon's sales team. Collier Decl. ¶¶ 2-3 (ECF No. 44-16). In that email, Collier explained the termination of several sales representatives, including MacKinnon, as follows:

> As you may know, we have made a few performance related changes in the Americas today. These were difficult decisions and are reflective [of] our sales performance in Q3/15. As a sales team we failed to deliver on our commitment to the company so I have taken these actions to shore up our business and our performance going into Q4/15. As stated these are largely performance based actions, [and] HR is already working to open new job requisitions in territories and positions affected by these actions. These positions should be posted by early next week.

Jan. 2, 2015 email (Ex. B to Collier Decl. (ECF No. 44-18)).

Although evaluations of an employee's performance are often non-actionable statements of opinion, *Jensen v. Hewlett Packard Co.*, 14 Cal. App. 4th 958, 970-71 (1993), Collier's email specifically refers to "sales performance in Q3/15." Thus, the email could reasonably be interpreted as implying that MacKinnon failed to meet his sales numbers for the third quarter of fiscal year 2015. Unlike general opinions about an employee's performance, this is an objectively measurable fact that could give rise to a defamation claim. *See, e.g.*, *Gould v. Maryland Sound Indus., Inc.*, 31 Cal. App. 4th 1137, 1153-54 (1995) (accusations of "poor performance" were unactionable statements of opinion, but accusation that employee "made a $100,000 mistake in estimating [a] bid" was an actionable "statement of fact susceptible to proof or refutation by reference to concrete, provable data").

However, the evidence conclusively establishes that MacKinnon did not achieve either his sales quota or sales forecast for the third quarter of the 2015 fiscal year. The sales incentive plan for the quarter shows that his team achieved only 75.98% of their sales quota. Ex. K to Wayne Decl. (ECF No. 39-12). MacKinnon admits that the team did not achieve its quota, and he further admits that the team failed to meet its sales forecast for the quarter. MacKinnon Dep. at 70:20 to 71:16 (Ex. B to Wayne Decl. (ECF No. 39-3)). He contends that his team leader, Bill Drucis, revised the sales forecast without consulting the rest of the team, *id.*, but that does not create a genuine dispute that the team failed to

7

meet its final sales forecast. In addition, the team failed to meet the original forecast, coming in "[j]ust below" it. *Id.* MacKinnon presents no evidence that sales performance was measured in any other way than by sales quotas and forecasts. Consequently, even if Collier's email were interpreted as presenting a statement of fact regarding MacKinnon's "sales performance in Q3/15," no reasonable juror could conclude that the statement was false. Defendants' motion for summary judgment on MacKinnon's defamation claim is therefore GRANTED.

## V. Age Discrimination

Finally, MacKinnon and Defendants both move for summary judgment on MacKinnon's age discrimination claims under the ADEA and Maryland Code, State Government section 20-602. The Court has requested supplemental briefing relevant to the latter claim, April 12, 2017 Order at 1-2, and now addresses only MacKinnon's ADEA claim.

The parties do not dispute the following procedural history: MacKinnon was terminated on January 2, 2015. He received a right to sue letter from the California Department of Fair Employment and Housing ("DFEH") on March 12, 2015. Ex. F to Labar Decl. (ECF No. 44-7). That letter instructed MacKinnon that, if he wanted a federal right to sue notice, he had to file a complaint with the EEOC "within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier." *Id.* MacKinnon filed EEOC complaints on May 20 and June 8, 2015, Ex. G to Labar Decl. (ECF No. 44-8), and received right to sue letters from the EEOC on June 18 and June 23, 2015, Ex. H to Labar Decl. (ECF No. 44-9).[4] He first sought leave to amend his complaint to add an ADEA claim on September 14, 2015. Mot. for Leave to File Second Am. Compl. (Ex. K to Notice of Removal (ECF No. 1-11)).

---

[4] The June 23 right to sue letter closed the May 20 complaint and was sent by the EEOC field office in Oakland, California. The June 18 letter closed the June 8 complaint and was sent by the EEOC field office in San Antonio, Texas.

8

Defendants argue that MacKinnon's ADEA claim is untimely. In response, MacKinnon relies on the June 23 EEOC right to sue letter and contends that his ADEA claim was timely because he filed it within 90 days of receiving that letter, as required by 29 U.S.C. § 626(e). He further argues that his May 20 EEOC complaint was timely filed within 180 days of his termination, as required by 29 U.S.C. § 626(d)(1)(A), but that statute does not apply in states, like California, that have "a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice," 29 U.S.C. § 633(b). In such states, the EEOC charge must be filed "within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier." 29 U.S.C. § 626(d)(1)(B). MacKinnon's DFEH right to sue letter correctly informed MacKinnon of these deadlines.

In this case, 30 days after receipt of the DFEH letter was earlier than 300 days of MacKinnon's termination. Thus, if MacKinnon wanted to file a separate EEOC complaint, he had to do so within 30 days of receiving the March 12, 2015 DFEH letter. He did not file his EEOC complaint until May 20, 2015 – 69 days after the DFEH letter was issued – and that filing was therefore untimely.[5] That MacKinnon sought leave to add his ADEA claim within 90 days of the June 23, 2015 EEOC right to sue letter is therefore irrelevant, as meeting the 90-day deadline "does not change the requirement that the filing of the charge with the EEOC must itself be timely. *See Phillips v. Gen. Dynamics Corp.*, 811 F. Supp. 788, 794 (N.D.N.Y. 1993) (discussing filing requirements under similar Title VII regulations).

Because MacKinnon's EEOC claim was untimely, the Court GRANTS Defendants' motion and DENIES Mackinnon's motion for summary judgment on his ADEA claim.

---

[5] Although MacKinnon might not have received the right to sue letter on the date it was issued, it would be unreasonable to conclude, and MacKinnon does not argue, that he did not receive it within a few days.

9

**CONCLUSION**

In sum, the Court GRANTS IN PART Defendants' motion for summary judgment and DENIES IN PART Plaintiff's motion for partial summary judgment. Summary judgment is GRANTED to Defendants as to all of MacKinnon's claims against Defendant Lifesize, Inc. and all claims except the Maryland statutory age discrimination claim against Defendant Logitech Inc. The Court has ordered supplemental briefing on that claim and will resolve whether summary judgment to either party is appropriate, along with Plaintiff's motion for summary judgment on Defendants' affirmative defenses, after considering the parties' additional arguments.

**IT IS SO ORDERED.**

Dated: 04/13/17

_____
THELTON E. HENDERSON
United States District Judge